# George Heffley et al., Plffs. in Err., *v.* Josiah Poorbaugh et al.

A judgment sustaining a will, attacked on the grounds of undue influence and want of testamentary capacity, affirmed.

(Argued May 11, 1887. Decided May 23, 1887.)

July Term, 1886, No. 216, E. D., before MERCUR, Ch. J., GORDON, TRUNKEY, STERRETT, and GREEN, JJ. Error to the Common Pleas of Somerset County to review a judgment for defendants in a feigned issue to try the validity of the will of Elizabeth Keiser. Affirmed.

The assignments of error were based upon the admission of certain offers of evidence by the defendants, upon the portions of the charge inclosed in brackets, and upon the answers to points, as stated below.

On the trial, defendants offered to show that Josiah Poorbaugh, a witness on the stand, and Hertz Keiser, husband of testatrix, "were in business for many years, and that witness's opportunities for becoming intimately and thoroughly acquainted with Mrs. Keiser were very numerous; and that by reason thereof he did become so acquainted, and that they were very intimate and on the best of terms for a long period; and that he has a complete and thorough knowledge of her mental capacity."

Plaintiffs' counsel objected to that portion of the foregoing proposition wherein it is proposed to show that the witness was in business with Hertz Keiser.

Objection overruled and evidence admitted.    First assignment of error.

The following question was put to the same witness:

"*Q*. Had you rare and few or many and good opportunities of becoming acquainted with the condition of his wife, Mrs. Keiser?"

Objected to that the question is too specific, and that it ought to be in a general sense.

Objection overruled and question admitted.    Second assignment of error.

The defendants' counsel proposed to show by the same witness the condition of Mrs. Keiser's mind, her acts, and her declarations up to the time of her death.

Objected to as irrelevant.

Objection overruled and offer admitted.    Third assignment of error.

The defendants' counsel proposed to prove by the same witness that at the time of Hertz Keiser's last visit with his wife to Berlin, in the fall of 1884, and in her presence, Mr. Keiser asked the witness if he knew where he kept his papers and where his secret drawer was, and that Poorbaugh replied that he did not.    Keiser then said: "The first time you come over I will show it to you."    Mrs. Keiser then spoke up and said: "Yes; and if anything happens, come quick, because they are on the watch to grab."

Objected to as irrelevant.

Objection overruled and evidence admitted. Fourth assignment of error.

Miss Lizzie Poorbaugh being on the stand, defendants' counsel asked her:

"*Q.* Did you ever hear her (Mrs. Keiser) express an intention or desire as to what should become of her property as much as eight or ten years ago ?"

"*A.* I did."

Objected to as incompetent; that her intentions eight or ten years ago could not govern now.

By the Court: "The evidence is pertinent only as it bears on the question of undue influence."

Objection overruled and evidence admitted. Fifth assignment of error.

The defendants' counsel proposed to prove by the same witness that shortly after the funeral of her husband and subsequently, Mrs. Keiser repeatedly declared that she could not and would not return to John H. Uhl's; and this because it has been alleged here that she was unduly influenced and kept away from Mr. Uhl's.

Objected to.

By the Court: "As the question of undue influence has been raised here, and the person at whose house she remained after her husband's death is a devisee and claiming under this will, it is evidence; it is somewhat remote it is true, but still it is evidence on that question."

Objection overruled and evidence admitted. Sixth assignment of error.

George Johnson being on the stand, defendants' counsel asked him:

"*Q.* From your knowledge of the woman, Mrs. Keiser, your conversation and intercourse with her, and what you saw and heard at that time, was she or was she not competent to make a will ?"

Objected to, not on account of the form of the question, but because the witness has not made himself competent to speak on the question of Mrs. Keiser's competency to make a will.

Objection overruled and question permitted. Seventh assignment of error.

Mrs. Valentine Hay being on the stand, defendants' counsel asked her:

"*Q.* Had you any conversation with Mrs. Keiser about her situation and the degree of comfort she enjoyed at Uhl's; and if so, what was that conversation?"

Objected to.

By the Court: "On the question of undue influence it is evidence; on the other question it is not."

Objection overruled and evidence admitted Eighth assignment of error.

The charge of the court below, BAER, P. J., was as follows:

The right to make a will and dispose of property, real or personal, according to the notions and wishes of the owner, is solemnly assured to every man by the law. It is a right which courts and juries must not disregard. To do so would be to substitute the will of the court and the jury for that of the testator, and that we dare not do. We are not here to make a will. Every sane man or woman has a right to dispose of his or her property precisely as he or she pleases, unless in some way controlled by some rule of the law, or because there is some provision of the law that prevents a certain disposition. Even an injudicious disposition of property, in the eyes of one's friends, will not avoid a will. It does not often happen that a man bequeaths his estate to the entire satisfaction of his family or relatives, and it is wholly immaterial whether they are satisfied or not; with his own he can do as he pleases. The purpose of making a will is not to divide a man's possessions equally among his relatives or the members of his family; on the contrary, the very purpose is that of creating inequality. The law itself gives equality when no will is made; but to create inequality requires a will. It may be harsh, it may seem unjust, it may indicate prejudice or partiality; yet all this is of no concern to you or the court, because, with a man's own he can do as he pleases.

We have nothing to do with the wisdom of the will in this case. Our duty is to inquire faithfully whether the paper alleged to be the will of Mrs. Keiser is her last will, and whether it was made when she well knew what she was doing, and not under undue influence. These are the two questions that are now before you.

The execution of this will, that is the signing of it, is made out beyond dispute. She signed it, if Mr. Brubaker and Mr. Seibert are believed; and there is no reason for disbelieving

them on this point. If she was of sound and disposing mind and memory at the time she signed it, and if it was not made through undue influence, it is her last will; and, in such case, it will be the duty of the jury to so find.

The supreme court, in the cases of late years coming before it, has said that "the growing disposition of courts and juries to set aside last wills and testaments, and to substitute in lieu thereof their own notions as to what a testator should do with his property, is not to be encouraged." I call your attention to this modern tendency to caution you from running into such error; because in a will case the duty of the court differs somewhat from that in an ordinary trial of a question of fact before a jury. In a will case the court must determine for the jury the sufficiency of the evidence; and it becomes my duty in this case to say to you that the evidence of the facts themselves, as to what occurred, is for the jury; but as to what such facts, when proven, constitute or make out, is a question of law for the court. In other words, you are the judges of what facts are proven; but the sufficiency of the facts, to make out capacity or incapacity, is for the court; and that the court must determine to you, no matter how unpleasant, in any particular case, it may be. In determining the question, you have nothing to do with the matter of one or a few relatives getting more than others; except in so far as such a disposition may have been made under undue influence, and the extent to which it bears, if it bears at all, upon the question of soundness or unsoundness of mind.

The first question is: Were her mind and memory sufficiently sound to enable her to know and understand the business she was engaged in, at the time when she executed the will? We are not left in the dark as to that, for the courts have decided that a person of sound mind and disposing memory is one who has a full and intelligent knowledge of the act he is engaged in, a full knowledge of the property he possesses, an intelligent perception and understanding of the disposition he desires to make of it, and of the persons and objects he desires shall be the recipients of his bounty.

If Mrs. Keiser understood in detail all that she was about at the time she made this will, and chose with understanding and reason between one disposition and another, and herself directed how her property should be given, and to whom, this was sufficient mind to make a will. So the supreme court rules, and you

and I are bound by that ruling. If, from any cause, she was so enfeebled as to be incapable of knowing the property she possessed, or knowing or realizing the effect of a disposition of it, or of understanding to whom she intended to bequeath it, then she was without the requisite testamentary capacity.

It is ruled as law that, in order to make a valid will, one must have memory; a person in whom this faculty is totally extinct cannot be said to possess understanding for any purpose; [but one's memory may be very imperfect; it may, at the time of making a will, be greatly impaired by old age or disease, even to such an extent as to leave the person unable, at all times, to recollect the names of friends, or to recollect persons or families, whom he or she had well and long known and been intimately acquainted with. Idle questions may at times be asked; and questions already asked and answered may be repeated; yet, with all this, the mind may be sufficiently strong and sound for many of the ordinary transactions of life and for making a will. One may have sufficient mind to make a will, when, at the same time, he or she would not have sufficient vigor and strength of intellect and memory to make and digest all the parts of a contract; so the rule is that it requires a sounder and stronger mind and memory to enter thoroughly into the details of a contract than it does to make a will; for all that is required to render her capable of making a valid will is that her mind and memory, at the time of making the will, shall be sufficiently sound to enable her to know and understand fully the business she is engaged in.][19]

Failure of memory is not sufficient to create incapacity, unless it be a total failure of memory; or unless the failure of memory, at the time of making the will, extended to one's family or property. Does such total failure of memory appear from the evidence in this case? This is a question of fact for you.

Sickness, old age, great distress, or bodily affliction, none of these are alone sufficient to incapacitate Mrs. Keiser from making a will. The case is to be determined by you on the facts; and, though many witnesses were called who expressed opinions, it is not to be determined by the mere force of numbers, expressing opinions one way or the other. Witnesses who are not experts—and in this case none are experts but the physicians called and, in a sense, the attesting witnesses to the will—can only give opinions as to capacity, after having stated facts within

their own knowledge, tending to show an unsound condition of mind; and whether a witness has testified to such facts as warrant an opinion is for the court to decide. A mass of testimony has been received, and opinions permitted to be given on facts that but faintly tended to show unsound condition of mind. The opinion of incapacity, founded upon facts that barely tend to indicate unsoundness, must be like the facts on which it is founded, weak in a degree proportioned to the weakness of the facts, and not strong like an opinion based on facts fully stated, which strongly indicate or tend to show unsoundness.

Hence you must exercise all your reasoning faculties, and must look to the facts detailed by the witnesses, and, in the light of the law as we lay it down, say and determine whether the witnesses' opinion was one justly and fairly deduced from the facts. It is our duty to say that an opinion based upon mere forgetfulness of names of persons, or upon mere forgetfulness of something just previously said or done, or upon the fact that Mrs. Keiser had great pain in her head, or that she was suffering from distress caused in some way, or that she said: "I fear I will lose my mind," or merely said: "My mind is so bad," is not, in itself, sufficient basis for an opinion that her mind was unsound, or that she was incapacitated to make a will. The facts upon which the opinion of unsoundness is based must be stated by the witness to the jury; and they must be such facts as tend to show that she had not sufficient mind or memory to comprehend and understand the business she was engaged in, or the conversation she was having at the time.

The importance of heeding these views must be apparent to the jury, for a most estimable gentleman, Mr. Megahan, testified as to the incapacity of this woman, and said very frankly that she was incapable of making a will; but, when tested on cross-examination, it was demonstrated that he would consider her incapable, although she might be precisely in that condition which the law regards as constituting capacity to make a will. Hence it is that the court, in a will case, must be specific, and guide you on the question of the sufficiency of the evidence.

So too, the opinions of Christian witnesses, whose conclusion, that the mind of the testator was unsound, is based on the fact that she did not treat all her relatives alike, or did not give all or any to the church, should, alone, have no weight in this case. You are not trying any such question. Such witnesses do not

know that, under the law, the owner of property can do with it as he pleases; and that, when one leaves neither parents, husband, wife, nor issue, there are no natural objects of one's bounty.

If, on careful consideration, looking at the witnesses on both sides—all of whom stand equally respectable and all of whom, testifying and giving opinions, are to be viewed alike and their opinions weighed on the facts stated, whether in favor of capacity or incapacity—and keeping in view the principle that all men are presumed to be of sound mind and must be so considered by a jury until unsoundness has been proved, if, we say, in the light of this principle of law and all the facts, you should find that the plaintiffs, who allege unsoundness of mind and want of capacity, have failed to prove it, then the case ends; and your verdict, without further inquiry, should be for the defendants.

The testimony of the plaintiffs is all to be considered, and viewed by you, in the light we have indicated; and, if you find the opinions of the witnesses to be warranted by the facts detailed, and you should find that Mrs. Keiser was of unsound mind before the day on which her will was made, then you are still not ready to decide this case.   You then turn to the all-important question in the case, and determine from the evidence what was the condition of her mind on the day the will was made; for, although her mind might have been unsound before, yet if, on that day and at that time, she fully understood and comprehended the nature of the business she was engaged in when she made her will, knew what estate she had, and knew how and to whom she intended to, and did bequeath it, then she had sufficient mental capacity to make her will; and the jury should so find.

The burden of proof to show that Mrs. Keiser was of sound mind at the time of making the will is on the defendants, if you find there was previous unsoundness; otherwise, not.   If the evidence has satisfied you that there was previous unsoundness of mind, then the burden is shifted to Poorbaugh and those claiming under the will, to show that at the time of making the will Mrs. Keiser was of sound mind.   And this burden then requires that the defendants, Poorbaugh and the other devisees, should show you that, at the time the will was made, looking at the time of dictating the memoranda and the time of executing

the will, testatrix was in such a state of mind and memory as fully to understand and comprehend the estate or property she had, the persons to whom she intended to, and did, bequeath it, and fully to understand the business in which she was engaged; and, if they have so shown by the evidence, they are entitled to the verdict, so far as it is affected by the question of testamentary capacity; and otherwise, not.

It is your duty to view the testimony of all the witnesses who were present at any time on the day the will was made. You have Josiah Poorbaugh, his wife and daughter Emma, as the first ones who were spoken to by Mrs. Keiser on the subject of making a will; they testify that it was by her request that the daughter, Emma Poorbaugh, wrote the memoranda, showing how she wanted the will made. They testify as to what was said about the amount of her estate, who she wanted to receive it, and how it was to be disposed of. If this is proved and not contradicted, does it show a knowledge of her estate and of the persons she wished to give it to? And was it of her own volition and not induced or brought about by these persons or any of them, or anybody else with their knowledge?

Subsequently, if the evidence is believed, you have present on the same day Josiah Poorbaugh and wife and Alexander Brubaker; and a will was made. These witnesses testify as to Mrs. Keiser's handing the paper containing the memoranda to Mr. Brubaker, saying she wanted a will made; that he wrote the will according to the memoranda on the paper, and read it over to her; that she said it was right and signed it; that Alexander Brubaker and William Seibert witnessed it; that she then said to Mr. Brubaker: "Be so kind as to say nothing about this," and received the will and kept it, she occupying a reclining position on the bed at the time. All these witnesses, from all that occurred, stating what did occur, say she was of sound mind.

Others of the family, Miss Lizzie Poorbaugh and Mrs. Poorbaugh, were about her that day and before and after; they speak of what she said and did, and say she was of sound mind. Strangers, too, were in that day. George Johnson says he was there on Monday or Tuesday at 10 o'clock; the family say he was there, that it was on Monday; and one of the daughters says she thinks it was in the afternoon. This is an immaterial contradiction. Was he there on Monday? Whether at 10 o'clock or in the afternoon is immaterial. You have heard his testi-

mony; he says she was of sound mind. Bowman and his wife were there, as they say, on that day and had interviews, the wife holding a long conversation with her; they say she was of sound mind.

As against all these witnesses who were there that day, assuming that Bowman and wife were there also, the plaintiffs, those who contest the will, allege that Mrs. Keiser was, on that day, utterly unfit to make a will; not that she was crazy, because it was not necessary that she should be crazy to render her unfit, but that she was not of a sound and disposing mind and memory. They call, among others, Rev. Mr. Weekly; he says he was there on this as well as on the succeeding Monday. He says that when he was up in her room she was stupid; but he also says she was not unconscious; he says, "I tried to have an intelligent conversation with her but failed;" and he concludes that she was not capable of making a will. He says the second time he was there which was a week later, she was still in bed but able to talk, though somewhat disconnectedly. He says she sometimes talked intelligently for a while, but she could not support a conversation. When this witness was on the stand the first time, he said that he could not say whether Bowman and wife were there on the first Monday or the second; when recalled, he said that Bowman and wife were there on the second Monday; and he gives a reason, stating that Mr. Pershing was not there any more at that time.

If she was stupid when Weekly was there, was she so at the time the will was made? Could a person be stupid during the short time he was in there; and, after that, during some other portion of the day, be perfectly conscious and of sound mind? That is a question of fact for this jury. Was this a temporary stupor? Can his testimony, when he says that she was stupid, and that of the other witnesses who testified to what she did and said on that day, of her having spoken and given directions, sat up in a recumbent position, and signed the will—can that be reconciled, if, in point of fact, there was a state of stupor continuing throughout the whole day? She may have only been so when he was there; and it may be true that, at other times during the day, she was precisely as the other witnesses say she was when they were there. These are questions of fact for you. Rev. Mr. Weekly says she was then not capable of making a will,

that she was stupid. Did this stupor continue all day? Whether it did or not, you must determine from the evidence.

The next witness was Mrs. Garman. She saw her on Saturday after the funeral, in an unconscious state; she saw her on Tuesday, in bed; and she says she was in the same condition then. She also saw her on Wednesday, when she was better; but she did not see her on Monday.

Mrs. Hartzel saw her on Saturday, and says she was unconscious; and she saw her in bed on Sunday, at which time she was not inclined to talk. On Monday she went over, but was stopped from going into the room; and so she didn't see her on Monday; but she heard some one in the room talking about $1,000.

Mr. Hartzel saw her in bed at Poorbaugh's on Monday. He says, "I don't know that I said anything to her on Monday; spoke to the others, and said good bye to Aunty."

Miss Permelia Heffley saw her on Monday. She says, "I spoke to her, but she did not reply." Those witnesses from these facts came to the conclusion that, on that day, she was of unsound mind. You will recall what facts they have related. Mr. Hartzel did not hear her reply at all. Miss Permelia Heffley spoke to her, and she did not reply. Whether a witness would be able to say, from that alone, that she was of unsound mind, I do not know. These people may have thought it proper to take into consideration what they knew of her long before, but you must determine what occurred there on that day.

Dr. Geary, the attending physician, says that on Saturday after the funeral he found her in a comatose state, and could not arouse her; and that she so remained two or three days; but he says on Monday she could talk some; so that, according to Dr. Geary's own statement, she was not in a comatose state all the time. He says when aroused on Monday she could talk sensibly; but, he says also, she would go back into a state of stupor again. He says she did not talk to him on Monday, and he judged from appearances; and, from this and from what he saw on Saturday, he considered she was incapable of making a will. It is necessary that the doctor's testimony be fairly taken, because a great deal of comment has been made upon it here, and he is entitled to have the whole that is material before you. He and some of the witnesses for the will differ as to some conversations; but the differences only go to credibility,

not to the material question in the case, except as to this comatose condition.

The material question is: Was Mrs. Keiser, on the day the will was made, of sound and disposing mind, and capable of making a will? It is due to the doctor to say that he said he judged from appearances; and he also said, upon the question being put to him, that if she knew her property and spoke of it, and knew her relations and the reasons for giving to one and not to another, at the time she made the will, then, in his opinion, she would be competent to make a will; and that is what every expert said who was on the stand. The experts do not differ as to the effect of the testimony; they differ only as to whether or not, in point of fact, she was unconscious, or in that comatose state, during this time; and on this question, you will take Dr. Geary on the one hand and these other witnesses on the other. If, during the making of the will, she was unconscious, or in a comatose state, all say, and the law would also say, she could not make a will. So on the other hand, if she had full knowledge of her estate, if she knew the business she was engaged in when she made the will, and knew the persons she intended giving it to, and did give it to, they all say, and the law says, she could make a will.

So the great question is: What was her condition on the day and at the time she made her will? Her condition afterwards was shown to have been one of mental soundness, if the evidence is believed; but this does not establish that she was mentally sound on the day the will was made. It is evidence to be considered by the jury, in connection with the evidence as to her condition on the day the will was made.

We have been asked to charge you and answer numerous points; and that will necessitate somewhat of a recapitulation, because the points are not all so drawn as to enable the court, in its view of the law, to answer them by a simple affirmative or negative; and some of them necessarily draw out remarks that are but in place in such answers.

There is a conflict as to the day on which the Bowmans called on Mrs. Keiser. That they were there is not denied; it is the time that is in dispute. Their testimony is stronger on the question of testamentary capacity involved in this case, if they were there on the first Monday after the funeral, instead of the second Monday. But it is evidence in the case, even though they were

not there until the second Monday; but, in the latter case, it would not be so strong, because it does not come back to the time of the making of the will. It would be subsequent evidence, but would still have to be considered by you.

You must consider all the evidence and all the contradictions in this case. So, too, as to the apparent or real contradiction, if any, of Mr. Poorbaugh by his letters, in so far as it relates to the actual condition of Mrs. Keiser. You will determine the case on all the evidence. What was her real condition on the day and at the time the will was made, as shown by the evidence, including the evidence, if any, of declarations made by the testatrix before making the will, as to any future intentions as to the manner of disposing of her property; which intentions, if any, and if consistent with the will, are evidence to be considered in connection with all that happened on the day the will was made.

We now come to the points that have been submitted by the counsel in this case. The first points are submitted by the counsel of the plaintiffs, that is by the counsel of the parties who say that this will was not made by a person who had a sound mind. What is meant by these points is that the counsel in the case draw them, and ask the court to say to you that the principles of law detailed in them are the law governing the case. If we agree with the counsel in regard to any given point, we affirm it; if we disagree, we refuse it. Sometimes, instead of simply affirming or refusing a point, we qualify it somewhat. By paying attention to what we say in answer to these points, you will understand how we mean to instruct you.

Plaintiffs' points and answers thereto.

I. That to render a person incapable of making a valid will it is not necessary that the jury should find that the person making the will was crazy or insane at the time the will was made; but it is sufficient to defeat the will, if the jury is satisfied from all the evidence that at the time the will was made, the testator was, from old age or bodily infirmity or both combined, so weak in intellect as not to understand the nature and effect of the act he or she was engaged in; and if the jury believe that Elizabeth Keiser was in that condition on the 20th of April, 1885, the time when the alleged will was made, then the verdict must be for the plaintiffs.

*Ans.* This we affirm.

II. That if the jury find from the evidence that Elizabeth

Keiser was, at the time of the making of the alleged will, of weak intellect, was prostrated by disease, was in the home of Josiah Poorbaugh, who with the members of the family are the principle beneficiaries under the will; that she had, besides the legatees named in the will, five brothers and sisters who are not named in the will, and that no cause is shown why said brothers and sisters should have been excluded from the will, the jury may take all these things into consideration on the question whether she had capacity to make a will.

*Ans.* The jury may take all these facts, if established, into consideration, in connection with all the other facts in the case on the question whether she had capacity to make a will. But in itself, although all the facts named in the point be found by the jury to be true, it is not sufficient to establish incapacity. (Ninth assignment of error.)

III. That the capacity required by law to make a will is that the testator shall have, at the time of making the will, a full and intelligent consciousness of the nature and effect of the act he is engaged in, a knowledge of the property he possesses, an understanding of the disposition he wishes to make of it, by the will, and of the persons and objects he desires to participate in his bounty. And if the jury believe that Elizabeth Keiser, at the time of making and executing the paper, purporting to be her last will and testament, by reason of old age, loss of memory, by bodily infirmity, or any other cause, failed in any of these particulars, so that she either did not comprehend the act she was engaged in, or did not have a knowledge of the property she possessed, or did not understand the disposition she was about to make of it, or the objects of her bounty, then said paper is not her last will and testament, and the verdict of the jury must be for the plaintiffs.

*Ans.* If the words, "objects of her bounty," in this case, are taken to mean the beneficiaries in the will, the point is affirmed. With that qualification we affirm it. (Tenth assignment of error.)

IV. If the evidence shows that Elizabeth Keiser did not have mental capacity to make a will prior to the 20th of April, 1885, then the burden is upon the defendants to show that she was of sound mind on the day the will was made; and such prior incapacity must be taken into consideration by the jury in determin-

ing the question of her testamentary capacity on the 20th of April, 1885, the day the alleged will was made.

*Ans.* If the contestants of this will have shown that Mrs. Keiser, prior to the 20th of April, 1885, the day the alleged will was made, had not a sound and disposing mind, had not mental capacity to make a will, then, it is true, the burden is on the proponents of the will, Poorbaugh and the other devisees, to satisfy you by proof that she was, at the time of making the will, of sound and disposing mind. And as the law presumes everybody to be of sound mind and capable of making a will until the contrary is shown, the jury must, when a will is assailed for want of testamentary capacity, take into consideration the fact of prior incapacity, if shown to have existed; and if no soundness of mind is shown at the date of the will, it falls because of prior incapacity; but if, in answer to previous unsoundness, it is shown to the jury that on the day and at the time of making the will she was of sound and disposing mind and memory, and knew and fully understood the nature of the business she was engaged in when making the will, then the will stands, for the jury must decide the case on the condition of her mind at the time the will was made.

V. If the jury believe that it is shown that Elizabeth Keiser was of weak mind, although it was not sufficient in itself to wholly destroy testamentary capacity, but was prostrated by sickness and was in a condition that she could have been easily imposed upon, that she was in the house of Josiah Poorbaugh, and surrounded by him and his family, and they were made the principal beneficiaries under the will, to the exclusion of five of her brothers and sisters, then these facts shift the burden from the contestants to the proponents to show that she had testamentary capacity to make the will, and that due care and caution was taken to guard her against imposition; and if the jury believe that she was not so guarded from imposition and that the will was drawn hastily upon memoranda made by Emma Poorbaugh, and the names of the legatees and beneficiaries furnished by Josiah Poorbaugh, then the jury may fairly conclude that it was not her free act; and the verdict must be for the plaintiffs.

*Ans.* This point, as drawn, is refused. But if, from the evidence, you find that Mrs. Keiser was of weak mind, although it be not sufficient in itself to wholly destroy testamentary capacity; and if you further find that the will was procured to be

written by Josiah Poorbaugh or Emma Poorbaugh or any one of Josiah Poorbaugh's family; and if she, then being prostrated by sickness, could easily be imposed on by Poorbaugh and family, who are the principal beneficiaries in the will and with whom she then lived, because of great confidence in them—then the burden of proof shifts from the contestants to the proponents, and they, Poorbaugh and the other defendants, the devisees, must show that she had testamentary capacity at the time, and also that she acted with full knowledge of the value of her estate; and if this is shown, the jury cannot conclude that it was not her free act, or the result of undue influence. And this would be so, even though the will was drawn upon memoranda made by Emma Poorbaugh, if the memoranda were made at the request of Mrs. Keiser or on her dictation and read to her, and the will written by a stranger, in conformity to the memoranda, and read to her and accepted as her will and duly executed, and although the names of some devisees were furnished by Josiah Poorbaugh, if the testatrix had directed $1,000 to be given to each of his children, a certain sum to him and his wife and her brothers Henry and Daniel and the residue to certain grandchildren.

If the devisees, the defendants, have shown both testamentary capacity in Mrs. Keiser and full knowledge of the value of her estate; and if the jury find that each of the devisees who was present at the making of the will has, upon the stand, sworn that there was no undue influence used by him or her, or to his or her knowledge, and find that the witnesses are respectively credible and not contradicted—then the jury cannot find against it on the ground of undue influence. (Eleventh assignment of error.)

VI. That although Josiah Poorbaugh, Margaret Poorbaugh, Emma Poorbaugh, Elizabeth Poorbaugh, Anna Poorbaugh, and Samuel W. Poorbaugh are competent witnesses in the case, yet the jury can take into consideration their interest as legatees under the alleged will as affecting their credibility as witnesses in the case.

*Ans.* Under existing laws Poorbaugh and his son, daughters, and wife, although interested as devisees under the will, are competent witnesses. They stand unassailed; but, being interested, such interest is properly considered by a jury on the question of credibility. It is but proper to say that the same

rule applies to Mrs. Julia Ann Heffley, a sister of the testatrix, who is one of those contesting the will; and although her children are not interested, the question of their near relationship to their mother, the contestant, is also a matter on the question of credibility; and these all stand, like the others, unassailed; and hence you determine their credibility from the testimony of the witnesses themselves, their manner of testifying, the contradictions, if any, and the probabilities of their statements. (Twelfth assignment of error.)

VII. That in a matter of this kind, where there is conflicting testimony as to the condition of the testator on the day and at the time the alleged will was made, and conflicting testimony upon an assumed state of facts by medical experts, the testimony of Dr. Geary, the attendant physician, is entitled to great weight, and if the jury believe his evidence as to the condition of Mrs. Keiser, on the 20th of April, 1885, the day the alleged will was made, then the verdict must be for the plaintiffs.

*Ans:* The testimony of experts is received to enlighten the jury, but not to control its judgment. Its force, effect, or weight may depend upon how far, by its intrinsic probability, it outweighs all conflicting testimony. The responsibility rests on the jury to render a correct verdict; and hence a jury cannot surrender its honest convictions of the truth, as found from all the evidence and the exercise of sound common sense and judgment, to the opinions of experts, no matter how greatly they are skilled. They must take into consideration the expert's means of knowledge, the reasons he assigns for his opinions, and give credence or withhold it, as they find his qualifications and the reasons he assigns to be sufficient.

Expert testimony is to be tried by the jury like all other testimony; and is to be tried by the same tests, and is to receive so much weight as the jury, in view of all the circumstances of the case, think it is entitled to, and no more. On a question of science like that involved in this inquiry—which is a question whether, at that particular time, testratrix was unconscious or not—an expert's testimony would have to be accepted; unless it is contradicted by the evidence of equally credible witnesses who are not experts, as to facts that common people can testify to as well as experts. An expert physician may be better prepared than the ordinary citizen to say that a sudden attack is paralysis or nervous prostration; but the expert physician is

entitled to no more credit or weight than any other equally credible witness on matters that men and women can see, and hear, and can do as well as an expert can. If credible witnesses say to you that, after her prostration and after the doctor left, she arose and was helped up stairs; that she spoke and ate something that evening or night; ate breakfast, dinner and supper and conversed on Sunday, and ate, could hold a conversation, and sat in a reclining position on her bed on Monday— these are facts that can be testified to and proven just as well by common people who are not experts as by experts; and the expert's testimony, in conflict, is entitled to no greater weight than others, if all are equally credible witnesses. You are judges of the credibility of witnesses; and when none are assailed they stand equally fair before you, and are to be believed, unless, from the evidence given by themselves or others, such inconsistencies, contradictions, or improbabilities are shown as would warrant you, as sensible men, to disregard it in whole or part. It is rarely the fact that experts agree, if called on opposite sides. Their testimony as experts is received from necessity, because it relates to something not seen or apparent, or that cannot be known by ordinary men. It stands no higher in the scale than the evidence of other people; but, like that of others, when uncontradicted, it is to be taken as the truth.

The remark of Dr. Brubaker (that, having heard the testimony of Dr. Geary, he would take the statement of his brother doctor as to her condition as true) was based upon the fact that he, as a physician, was better able to tell it than a layman. You are not to take it to be her true condition, as against the witnesses who say she conversed and washed herself on that day; for when Dr. Brubaker was asked what would be the effect of certain facts inconsistent with those that were testified to by Dr. Geary, he said it would be to show that she was competent to make a will. Dr. Brubaker's remark was to the effect that the facts, as alleged by Dr. Geary, if found to be true as against all the other evidence, would sustain Dr. Geary's opinion; otherwise not. (Thirteenth assignment of error.)

VIII. Even if the jury believe that at the time the alleged will was executed Elizabeth Keiser was able to talk, as certain witnesses present testify, nevertheless if the jury find that she was, at the time, of weak intellect and had been for two or three days prostrated by sickness, then the verdict in this case must

be for the plaintiffs; because it is admitted that Josiah Poor-baugh and members of his family are the principal legatees under the alleged will, and some of these legatees were with her during the whole of the time of the execution of the will and there is no proof that the testatrix was informed at the time of the amount or character of her property, nor who were her relatives.

*Ans.* We are not prepared to say that the testatrix had not been informed of the character, and had not precise knowledge of the amount and condition of her estate and the proportions and amounts the beneficiaries take under the will; nor at the time there was any weakness of mind, or that such knowledge had not been imparted. The point assumes a set of facts, the existence of which is a question for the jury and not for the court; and the point is refused. (Fourteenth assignment of error.)

Defendants' points and answer thereto.

I. That the testimony offered in this case, in support of, or to establish, the testamentary incapacity of Elizabeth Keiser on the 20th of April, 1885, is clearly insufficient to justify a verdict in favor of the plaintiffs upon this count in the declaration.

*Ans.* We reserve our answer to this point.

II. That there is no such evidence in this case, showing undue influence, fraud, or imposition, practised upon Elizabeth Keiser at the time of making her will, on the 20th of April, 1885, as would justify the jury in finding a verdict in favor of the plaintiffs on this count in the declaration; and all the evidence in this case upon the subject of undue influence should be withdrawn from the jury.

*Ans.* We answer this by saying that we have answered it in connection with the fifth point of the plaintiffs.

III. That it is the duty of the court to determine the sufficiency of evidence on testamentary capacity, as well as that of undue influence; that in this case there is no such evidence of either as would justify the jury in finding for the plaintiffs; and the verdict should, therefore, be in favor of the defendants.

*Ans.* That point raises a question of law, which, so far as the jury is concerned, is immaterial; and we reserve it.

IV. The legal presumption in this case, as in all others, is in favor of the validity of the will.

*Ans.* This point we affirm.

V. Old age, failure of memory, or mental weakness do not, of themselves, constitute incapacity to make a will.

*Ans.* This point we affirm. (Fifteenth assignment of error.)

VI. On the question of the testamentary capacity of a dying person, or one suffering from severe illness, the fact of an occasional flightiness or wandering of intellect during sickness is generally of very slight importance.

*Ans.* We affirm this point.

VII. Notwithstanding temporary mental disorder, the presumption is still that a man is competent when he makes his will; and the contrary must be proved before a jury can find it.

*Ans.* We affirm this point. (Sixteenth assignment of error.)

VIII. If a testator understands in detail all that he is about, it is quite sufficient to sustain his will; it is not necessary, at the time, to have a recollection of all his estate, his family relations in life, their condition in general and the probable effect the proposed disposition will have, and to collect this all in one view.

*Ans.* The eighth and ninth points cover, to a large extent, the same ground. The eighth point, with the qualification which we shall give it in the answer to the ninth, is affirmed.

IX. If a testator designs to give the whole of his estate to a stranger, to the exclusion of his collateral relations, or to one or more of such relations to the exclusion of the rest, it is not necessary that he should have a recollection of the property he intends to dispose of or of persons thus related to him.

*Ans.* If Emma Poorbaugh wrote the memoranda at the request of her aunt, Mrs. Keiser, and as dictated by her aunt, as a guide to a person who should be called to write her will; and if her aunt took the paper after it was read to her, and held it until a scrivener, at her request, was brought, and then handed it to him with directions to draw her will, which, after it was written, was read to her and by her acknowledged to be right, and was signed by her and witnessed, and then kept by her, and she requested the scrivener to say nothing about it; and if by such will, made in conformity with the memoranda, she gave all her estate to her brother, Josiah Poorbaugh, his wife, their children, two grandchildren, and her brothers, Henry and Daniel, she having no issue, husband, or parents—then the soundness of mind which would warrant her in making the will is not affected by the absence of proof that she knew all her rela-

tives. It was enough if she fully knew and comprehended the business she was engaged in while making the will, and knew what property she had, and had knowledge of Josiah Poorbaugh and the other devisees, whom by her will she made her beneficiaries; and as to whether she knew or did not know this, the jury must determine, not only from what was said and done at the very moment of making the will, but also from what was said and done by her on the same day at the time when she directed the memoranda to be made. Both these transactions entered into the making of the will. (Seventeenth assignment of error.)

X. That the condition of this testatrix, at the time of the execution of the will, on the 20th of April, 1885, is the question most carefully to be considered by the jury; and, if she had testamentary capacity at that time they should disregard the evidence of the plaintiffs' witnesses regarding her mental condition at all other times.

*Ans.* This point is affirmed. (Eighteenth assignment of error.)

In determining this case you may bring in your verdict, either in favor of the will or against it; and we will regulate the form of the verdict when it comes before us.

It is proper for us to say to you that while Dr. Geary, in answer to the hypothetical question put to him by the counsel of the defendants, said that, assuming the facts there stated to be true, Mrs. Keiser was competent to make a will, he said also, at the same time, that from what he had seen of her he did not think she could have been in the condition assumed in the hypothetical question.

[It is also proper to say to you that the memoranda prepared by Miss Emma Poorbaugh were read by Mr. Brubaker before he wrote the will. Mrs. Keiser said to him: "I want my will made;" but the memoranda had been read to her by somebody else, not by Mr. Brubaker. It is, however, immaterial by whom it was read to her.][20]

*Coffroth & Ruppel* and *W. H. Koontz* for plaintiffs in error.

*John Cessna* and *H. L. Baer* for defendants in error.

Per Curiam:
This case presented questions of fact. They were submitted

to the jury in a clear and correct charge. Some extracts discon-
nected with the residue might appear erroneous; but when con-
sidered in connection with the whole charge, they are not in-
accurate or misleading. We discover no error relating to the
admission of evidence, nor in the answers to the points.

Judgment affirmed.